# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8146 | **DATE** | 9/12/2002 |
| **CASE TITLE** | Automotive Finance Corp. vs. Ridge Chrysler Plymouth, LLC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Both Sides' motions for summary judgment are denied. (11-1, 17-1) This action is set for a status hearing at 9 a.m. September 25, 2002 to discuss the procedures and timing for addressing and resolving the questions just identified under the rubric of Remaining Issues.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 13 2002 | |
| | Notified counsel by telephone. | | date docketed | 28 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 9/12/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| SN | courtroom deputy's initials | | SN | |
| | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
02 SEP 12 PH 3:52

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AUTOMOTIVE FINANCE CORPORATION, )
                                 )
              Plaintiff,         )
                                 )
       v.                        )     No.  01 C 8146
                                 )
RIDGE CHRYSLER PLYMOUTH L.L.C.,  )
et al.,                          )
                                 )
              Defendants.        )

MEMORANDUM OPINION AND ORDER

Automotive Finance Corporation ("Automotive") has filed a
two-count complaint against Ridge Chrysler Plymouth, L.L.C.
("Ridge") and Gerald Gorman ("Gorman"), claiming that Ridge and
Gorman have failed to comply with a contractually specified
prepayment penalty[1] in violation of Illinois and Indiana law.
Because both sides have viewed the issues posed by this case as
purely legal rather than factual in nature, each has now filed a

_____

[1]     When used in conjunction with the term "prepayment,"
the term "penalty" is not customarily understood to carry the
connotation of its being unenforceable as a matter of law.
Indeed, the more accurate (and neutral) label is "prepayment
premium."  But because Paragraph 6 of the March 14, 2001 Credit
Agreement between Automotive and Ridge ("Agreement," Complaint
Ex. A) is captioned "Prepayment Penalty" and is obviously not
intended to suggest the uncollectibility of that so-called
"penalty," this opinion will employ the "prepayment penalty"
label simply to denote an amount that may properly be collectible
by a lender as a premium for its having lost the benefit of the
bargain pursuant to which it is entitled to receive specified
payments in liquidation of its loan.  By contrast, an
"unenforceable penalty" will be used to denote a "penalty" in the
customary sense, as meaning a grossly disproportionate or
unconscionable (and hence uncollectible) charge.

Fed. R. Civ. P. ("Rule") 56 summary judgment motion.[2]  But for

the reasons set forth in this opinion, each side's motion must be

and is denied.

Summary Judgment Standards

Familiar Rule 56 principles impose on any party moving for

summary judgment the burden of establishing the lack of a genuine

issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317,

322-23 (1986)).  For that purpose this Court must "consider the

evidentiary record in the light most favorable to the non-moving

party...and draw all reasonable inferences in his favor" (Lesch

v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).

And Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001) has

echoed the teaching of Anderson v. Liberty Lobby Inc., 477 U.S.

242, 248 (1986):

> A genuine issue of triable fact exists only if "the evidence
> is such that a reasonable jury could return a verdict for
> the nonmoving party."

Where as here cross-motions for summary judgment are

---

[2]     Each side has complied with this District Court's LR
56.1, designed to facilitate the resolution of Rule 56 motions by
highlighting the existence or nonexistence of factual disputes.
This opinion cites to the two LR 56.1(a)(3) statements as "A. St.
¶ -" and "R. St. ¶ -."  Responses to those statements are cited
as "R. Resp. ¶ -" and "A. Resp. ¶ -."  Defendants' LR
56.1(b)(3)(B) statement of additional facts is cited as "R. Add.
St. ¶ -," and the corresponding response is cited as "A. Resp.
Add. St. ¶ -."  This opinion employs the same "A." and "R."
abbreviations in referring to each of the parties' exhibits
("Ex."), memoranda ("Mem."), answering memoranda ("Ans.Mem.") and
reply memoranda ("R. Mem.").

2

involved, it is thus necessary to adopt a dual perspective.  This
opinion reflects that approach where appropriate.

Facts

Gorman is the manager of automobile dealership Ridge (A. St.
¶¶6-7).  Automotive, in the business of providing loans to
automobile dealers, loaned Ridge $1.45 million pursuant to the
Agreement's terms (A. St. ¶¶3, 9-10).  Under those terms Ridge
agreed to sell the insurance products of a company called
Protective, including vehicle service contracts and Gap policies
(R. Add. St. ¶¶1, 3-4).  All money owed to Ridge arising from its
sale of Protective products was to be transmitted by Protective
directly to Automotive in partial satisfaction of Ridge's
principal and interest obligations (id. ¶2).

More specifically, Agreement ¶5 provided:

> Borrower [Ridge] represents that until Lender [Automotive]
> is paid in full under this Agreement, Borrower has
> irrevocably directed Protective to pay Lender all moneys
> owed to Borrower pursuant to the Protective Agreement.  The
> parties agree to apply the $289 payments per Service
> Contract from Protective to Lender to the principal and
> interest owed by Borrower to Lender under this Agreement.
> Except as provided below the parties agree to apply the $92
> payment per Gap Policy from Protective to Lender to the
> principal and interest owed by Borrower to Lender under this
> Agreement.  The parties agree that such monthly payments
> shall be paid on the 1st of each month.

Agreement ¶5 went on to provide what would happen if Ridge failed
to sell the required minimum numbers of Protective products in
any given month (id.):

During the term of this agreement Borrower shall sell at

3

least 125 Service Contracts per month. If Borrower sells less than 125 but more than 120 Service Contracts during this period, then Borrower shall be allowed to carry the deficiency over to the next month's tally; however, Borrower must make up any deficiency under 125 in the next month before being allowed to apply any Service Contract sold to the new month's requirement. If Borrower fails to sell at least 121 Service Contracts per month, then Borrower shall, within 3 business days following the end of such month, pay Lender $364.00 ($289.00 in lost principal and interest payments plus a $75 fee) for each Service Contract under 125. If the Borrower sells in excess of 125 Service Contracts per month, the contracts over 125 will be carried over to the subsequent month's tally of Service Contracts sold.

During the term of this agreement Borrower shall sell at least 45 Gap Policies per month. If Borrower sells less than 45 but more than 40 Gap Policies during this period, then Borrower shall be allowed to carry the deficiency over to the next month's tally; however, Borrower must make up any deficiency under 45 in the next month before being allowed to apply any Gap Policies sold to the new month's requirement. If Borrower fails to sell at least 41 Gap Policies per month, then Borrower shall, within 3 business days following the end of such month, pay Lender $167.00 ($92.00 in lost principal and interest payments plus a $75 fee) for each Service Contract [sic] under 45. Any Gap Policies Borrower sells in excess of 45 per month will not be included toward principal payments.

In addition to the payments to Automotive described in the two just-quoted paragraphs of the Agreement, Automotive received further payments directly from Protective--$18 for each Gap policy and $121 for each service contract sold by Ridge (R. Add. St. ¶¶5-7). While Ridge says that it was ignorant of those payments (R. Ans. Mem. 4) and Automotive offers no evidence to the contrary, Automotive claims that Ridge should have known that Automotive was receiving additional money from Protective (A. R. Mem. 13-14).

4

Agreement ¶1 specified a 36-month term, which began on April 1, 2001 and was scheduled to end on March 31, 2004 (R. St. ¶10). At the heart of the current dispute is the Agreement ¶6 provision, triggered if Ridge were to prepay its loan obligation within the first 12 months:

> **PREPAYMENT PENALTY.** If Borrower, at any time during the first twelve months of this agreement, prepays the balance of the Borrowed Funds, Borrower shall pay as a prepayment penalty an additional 15% on the principal due, unless such prepayment is paid by way of sales of the Service Contracts.

No prepayment penalty whatever would be due, however, if prepayment were to take place even one day after March 31, 2002.

On July 9, 2001 Automotive provided Ridge with a letter indicating the payoff figure for Ridge's obligations under the Agreement (R. St. ¶20). Automotive stated that Ridge owed $1,479,901.01, comprising a principal balance of $1,286,879.44 and a prepayment penalty of $193,030.57 (id.). On July 20 Ridge paid Automotive $1 million and informed Automotive that it was attempting to verify the proper amount due (id. ¶21; A. St. ¶21). After receiving that July 20 payment plus an additional payment on August 10, Automotive maintained that Ridge still owed some part of the principal balance plus a prepayment penalty of $189,907.42 (R. St. ¶22). On September 20 Automotive received Ridge's payment of the amount specified as outstanding principal, but Ridge refused to pay the claimed prepayment penalty (id. ¶¶23, 24).

One other facet of the controversy is identified here only briefly because it is concededly in factual dispute and has not been fully fleshed out by the parties' submissions: Ridge's assertion and Automotive's denial that the prepayment penalty was waived in any event because it was Automotive that demanded prepayment of the loan. Because the ensuing analysis is not fully dispositive of the litigation, that issue remains to be addressed together with the question of what actual damages Automotive may be able to prove in lieu of the unenforceable penalty.

Unconditional Guaranty

On the same day the Agreement was executed, Gorman signed an Unconditional Guaranty ("Guaranty," Complaint Ex. C), promising to pay immediately any amount owed by Ridge in the event that Ridge failed to make any payment when due (A. St. ¶¶14-16):

> In case the Debtor [Ridge] shall fail to pay all or any part of the Liabilities when due, whether by acceleration or otherwise, according to the terms thereof, the undersigned will immediately pay the amount due and unpaid by the Debtor in like manner as if such amount constituted the direct and primary obligation of the undersigned.

Gorman also agreed to "pay all costs, expenses, and attorneys' fees incurred by AFC [Automotive] in the enforcement of this guaranty" (id.; A. St. ¶17). Gorman too has refused to pay the amount claimed as the prepayment penalty and to pay any costs, expenses and attorneys' fees incurred by Automotive in its attempts to collect that sum (R. St. ¶24).

## Unenforceability of the Prepayment Penalty

If the Agreement's prepayment provision is unenforceable, Automotive's attempt to recover that specified amount is dead in the water. And that is so no matter how unambiguous the contract language providing for the prepayment may be.

To succeed on any breach of contract claim under Illinois law,[3] a plaintiff must prove (1) the existence of a valid and enforceable contract, (2) performance by plaintiff, (3) breach by defendant and (4) resultant injury to plaintiff (<u>Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.</u>, 323 Ill. App.3d 15, 27, 752 N.E.2d 33, 43 (1st Dist. 2001)). Automotive asserts that Ridge's failure to pay the claimed prepayment penalty and accrued interest constitutes a breach (A. Mem. 6). But only reasonable prepayment penalties are enforceable (<u>In re LHD Realty Corp.</u>, 726 F.2d 327, 330 (7th Cir. 1984)). Hence if Agreement's prepayment penalty is unreasonable and is thus not enforceable, Ridge's nonperformance is not a breach.

Ridge invokes the familiar comparison between enforceable liquidated damages provisions and unenforceable penalties to argue that Agreement's 15% prepayment penalty is an unenforceable penalty clause (R. Mem. 3-6, R. Ans. Mem. 4-5). Automotive counters that a liquidated damages vs. unenforceable penalty

-------

[3]    Both sides assume that Illinois substantive law governs the Count I breach of contract claim against Ridge (A. Mem. 5; R. Mem. 3). This opinion will do likewise.

7

analysis of Agreement ¶6 is misplaced (A. R. Mem. 7). Its
argument boils down to this: In contrast to a liquidated damages
provision, which is entered into in advance of a breach of
contract to fix damages for a particular breach, a prepayment
penalty is simply "bargained for consideration" for the
contractual option to prepay the loan (id., citing West Raleigh
Group v. Mass. Mut. Life Ins. Co., 809 F. Supp. 384, 386
(E.D.N.C. 1992)).

But in any event the real question is not whether Agreement
¶6 sets damages for a breach, but rather whether that paragraph
calls for payment of an unenforceable penalty. Despite criticism
of the Illinois caselaw by our Court of Appeals (Lake River Corp.
v. Carborundum Co., 769 F.2d 1284, 1289-90 (7th Cir. 1985)),
Seventh Circuit decisions repeatedly confirm that penalty clauses
remain unenforceable under Illinois law even if both contractual
parties are sophisticated (id.; Checkers Eight Ltd. P'ship v.
Hawkins, 241 F.3d 558, 562 (7th Cir. 2001).

It is true that either payments in accordance with the terms
outlined in Agreement ¶5 or a full prepayment of the outstanding
loan balance would constitute "performance" by Ridge in the
global sense, for Ridge's basic obligation under the Agreement--
like that of any borrower--was to repay the money it had
borrowed. But the fact that prepayment is one way to perform
Ridge's ultimate obligation does not preclude the prescribed

prepayment penalty from being unenforceable. Agreement ¶5 sets forth in detail the desired method for Ridge's performance of its obligation--essentially a formula that would, if conformed to by Ridge, assure a flow of funds that would essentially self-amortize the loan over its 36-month term (thus serving the dual purpose of such self-amortization: current yield to the lender in terms of the interest component of each monthly payment, and a regular monthly reduction in the loan amount at risk by reason of the principal component of each payment). Then Agreement ¶6 states what would happen if Ridge did not perform in accordance with the stated method but elected instead to prepay the loan balance during the first loan year.

While prepayment is not technically a breach of the Agreement (because Ridge would have fully repaid its loan obligation), prepayment does represent a nonconformity to the payment terms specified in detail in Agreement ¶5. Ridge's contractual obligation was not simply to repay the borrowed funds--it was to repay the borrowed funds, until payment was made in full, by selling the specified numbers of Protective products at the prices specified in Ridge's agreement with Protective and repeated in Agreement ¶5. So the prepayment penalty as set out in Agreement ¶6 represented a means of creating pressure on Ridge to adhere to those sales obligations during the first loan year--after which Ridge was free (so far as Automotive was

concerned) to ignore those obligations by paying off the loan free of any added cost whatever.

Thus the cases comparing liquidated damages for breach with unenforceable penalties provide an apt analogy here. As those cases teach, the consequence for failing to comply with contractual terms must be reasonably related to the anticipated harm likely to come from noncompliance (see, e.g., Lake River, 769 F.2d at 1289-90; Hidden Grove Condo. Ass'n v. Crooks, 318 Ill. App.3d 945, 947, 744 N.E.2d 305, 307 (3d Dist. 2001)).[4]

Lake River, 769 F.2d at 1289-90 has summarized the test under Illinois law for differentiating between an enforceable liquidated damages provision and an unenforceable penalty:

> To be valid under Illinois law a liquidation of damages must be a reasonable estimate at the time of contracting of the likely damages from breach, and the need for estimation at that time must be shown by reference to the likely difficulty of measuring the actual damages from a breach of contract after the breach occurs. If damages would be easy to determine then, or if the estimate greatly exceeds a reasonable upper estimate of what the damages are likely to be, it

_____

[4] Automotive itself appeared to recognize that the principles involved in analyzing the reasonableness of liquidated damages provisions are instructive in determining the reasonableness of prepayment premiums in its first brief to this Court, quoting at A. Mem. 5 this language from In re Schaumburg Hotel Owner Ltd. P'ship, 97 B.R. 943, 953 (Bankr. N.D. Ill. 1989) in support of its argument that reasonable prepayment premiums are enforceable:

> A liquidated damages provision is enforceable if the amount is a reasonable estimate of damages for the harm caused by a breach and if the harm is incapable or very difficult to estimate accurately.

is a penalty.[5]
No matter what label the parties apply to a contractual term,
Illinois law states that contract provisions may not serve as a
"threat used to secure performance" (<u>Med+Plus Neck & Back Pain
Ctr., S.C. v. Noffsinger</u>, 311 Ill. App.3d 853, 860, 726 N.E.2d
687, 693 (2d Dist. 2000); accord, <u>Checkers Eight</u>, 241 F.3d at
562). It is well established that "if the purpose of the clause
fixing damages is merely to secure performance of the agreement,
it will not be upheld" (<u>Hidden Grove</u>, 318 Ill. App.3d at 947, 744
N.E.2d at 307)). So while reasonable prepayment penalties are
enforceable (<u>LHD</u>, 726 F.2d at 330), the Agreement ¶6 prepayment
penalty is invalid if it is an attempt to coerce Ridge's
contractual performance in compliance with the sales requirements
described in Agreement ¶5. Enforceability depends on whether the
15% figure is grossly disproportionate to the contractual
benefits that Automotive would likely lose if Ridge elected to
prepay rather than to perform by selling Protective products.

Each side has presented a series of calculations designed to
support its interpretation of the reasonableness of the
prepayment penalty. Ridge submitted an amortization schedule

---

[5]    [Footnote by this Court]  That actual damages at the
time of prepayment are not always difficult to measure simply
makes a traditional liquidated damages analysis an imperfect tool
for analyzing prepayment premiums.  It certainly does not
prescind either the significance of the prohibitions against
penalty clauses or the methods for identifying contractual
penalties, as articulated in cases involving liquidated damages.

representing the interest and principal allocations on a
$1,450,000 loan payable in monthly installments over a 36-month
term at an interest rate of 10% ("Schedule") (R. Ex. A). Because
both sides relied on the Schedule in their computations, this
opinion has done the same.[6]

As the first step in this opinion's evaluation of the
reasonableness or unreasonableness, it is important to repeat
that Agreement ¶6 applies <u>only</u> to a prepayment of the loan by
Ridge within the first 12 months of the loan term and not
thereafter. Automotive was to receive just 53.5% of the total
expected interest payments in the Agreement's first year,[7]
obviously triggering inquiry as to why the requirement of any
prepayment penalty would terminate at that time. Automotive
argues that the 12-month cutoff date is not arbitrary because
"many states provide by statute that prepayment penalties must be
limited to the first twelve months of a loan" (A. R. Mem. 14).
But that position is without support in the statutes cited by
Automotive: N.C. Gen. Stat. §24-10 does not require the
termination of prepayment penalties after 12 months, and Mass.

---

[6] It is true that the self-amortization Schedule does not
precisely track the minimum purchase requirements of Protective
products set out in Agreement ¶5 (125 Service Contracts at $289
each plus 45 Gap Policies at $92 each, or a total of $40,148 per
month). But the numbers in the Schedule, in addition to the
parties having joined in using them, are close enough for
analytical purposes.

[7]    $125,372.47 = .534986 x $234,347.12

Gen. Laws ch. 183, §56 merely provides that in the event of prepayment of a mortgage loan on a dwelling house, any prepayment premium is limited to the lesser of (1) the balance of the first year's interest or (2) three months' interest. Indeed, any such post hoc rationalization is a total red herring as to the inclusion of the 12-month provision in an Illinois contract, where this state has enacted no such prohibition. Absent any real explanation from Automotive as to why it is reasonable to require a 15% prepayment penalty well into six figures on day 365 but not to require even a penny for prepayment on day 366, it must then be concluded that the 12-month cutoff is wholly arbitrary--a major clue to its unreasonableness.

Even apart from the total arbitrariness of its 12-month cutoff date, the prepayment penalty's validity depends on the losses that the parties could reasonably have anticipated at the time they entered into the Agreement (see Lake River, 769 F.2d at 1289; Hidden Grove, 318 Ill. App.3d at 947, 744 N.E.2d at 307; Schaumburg Hotel, 97 B.R. at 953-54). Automotive urges that the prepayment penalty is reasonable because the potential damages resulting from prepayment--that is, the difference between the 10% interest rate provided for in Agreement ¶3 and the rate of interest that would be available to Automotive upon prepayment and reinvestment--were incapable of estimation at the time of contracting because the date of prepayment and the then-available

interest rate were unknowns (A. Mem. 6). While that is so, the
real question is whether 15% of the principal balance outstanding
at the time of prepayment during the first loan year represents a
reasonable effort to estimate any such loss.

To that end it is reasonable for Automotive to have expected
compensation for losing the benefit of its bargain--and in this
instance that meant any reduction in anticipated interest
payments that would flow from Ridge's prepayment during the first
12 months of the loan (LHD, 726 F.2d at 330). As for the rest of
the prospective term of the loan--the remaining 24 months--
prepayment during any part of that time frame would not deprive
Automotive of any part of the bargain that it had struck with
Ridge. It takes only a moment's thought to recognize that a
lender that gives its borrower an unfettered right to prepay the
loan is really giving the borrower a cost-free option: either
make the payments at the time or times specified in the loan
document or pay off the loan ahead of schedule. If interest
rates are static or on the rise, the borrower can cheerfully
adhere to the scheduled payments. But if interest rates fall,
the borrower can even more cheerfully go into the market,
negotiate a more favorable loan at the new rates and use the
proceeds to pay off the old loan. And in that event the original
lender is compelled to return to the market too, putting the
repaid funds to work at a lower rate.

It is easy for the lender to protect itself from the adverse effects of that one-way alternative:[8] Impose some limitation or limitations on the right of prepayment--limitations that may, among other possibilities, take the form of specifying a prepayment penalty (subject to the requirements of reasonableness imposed by courts or legislatures). Knowledgeable lenders do that all the time--and the carefully crafted provisions of the Agreement surely place Automotive in that "knowledgeable" category. Yet Automotive, for reasons best known to itself, opted not to include any such constraints at all on Ridge once the loan's first anniversary had passed.

That being so, Automotive cannot cavil at any claimed "deprivation" of the scheduled interest payments during the last two years of the stated term. If market interest rates were then to have gone down (the only basis on which Automotive could peg a theory of having been hurt by prepayment of its loan), Ridge would have been perfectly free to take advantage of that same decline to pay off the loan cost-free, wiping out any potential claim. Most simply put, Automotive had no enforceable right to those interest payments because Ridge could at its will, and at any time during those two years, have eliminated Automotive's opportunity to receive them.

---

[8] Such a one-way street is of course present in every option. That is why obtaining an option typically carries a cost of acquisition.

This Court is not about to create for Automotive a bargain that it was free to make but (for whatever reason) chose not to.[9] Hence the only relevant inquiry for purposes of the required comparison in this case properly focuses only on the loan interest that would have been payable in the first 12 months from April 1, 2001 through March 31, 2002--an amount that the Schedule shows as $125,372.47 (R. Ex. A).

It is unnecessary to parse every alternative scenario to demonstrate the dramatic disparity that shows how unreasonable the prepayment penalty was in relation to any potential loss by Automotive of the benefit of its bargain, even at the ex ante point of uncertainty when the Agreement was signed. Just a few examples will suffice.

If for instance Ridge had prepaid its loan balance on the very first day of the Agreement's term, at a time when Automotive would have received no interest payments, it would get a prepayment premium of $217,500,[10] amounting to about 173% of the total interest of some $125,000 that it would have expected to

---

[9] This Court is well aware of the anomaly involved in giving the other party, Ridge, possible relief from one aspect of a bargain that it made. But that result is forced by this Court's obligation, under the Erie v. Tompkins mandate, to adhere to the Illinois courts' rulings in that respect (despite our Court of Appeals' trenchant criticism).

[10] $1,450,000 x .15 = $217,500. All later figures are drawn from the Schedule.

receive during the first loan year.[11]  If instead Ridge had
prepaid on the last day of the sixth month, Automotive would have
already received bargained-for interest payments totaling
$68,113.48--so that its receipt of a prepayment penalty of
$185,608.34[12] would amount to nearly 325% of the remaining
$57,258.99 in loan interest that would have been anticipated per
the Schedule during the last six months of the first loan year
(and that therefore, as stated earlier, would have been the
maximum that Automotive could claim as a lost entitlement).  And
of course if Ridge had prepaid on the last day of the twelfth
month, Automotive would receive a prepayment penalty of
$152,088.51[13] even though it had already gotten every penny of
interest that it could claim as of right--a truly infinite
disparity, for the prepayment penalty would then be divided by

---

[11]  This and the next two comparisons seriously understate
the wide disparities involved in two respects:

  1.  Because the prepayment penalty is received
  currently, while any lost interest payments would have been
  made in installments, the latter amounts should be reduced
  by discounting them to present value for a valid comparison.

  2.  Because prepayment would return the loan principal
  to Automotive for potential investment, its real world loss
  of interest would not even approach the Schedule
  amount--instead it would be measured by the difference
  between the Agreement's 10% rate and any lower rate earned
  on reinvestment.

[12]   $1,237,388.96 x .15 = $185,608.34

[13]   $1,013,923.43 x .15 = $152,088.51

zero because Automotive would have sustained no loss of its
bargain whatever.

These contrasts alone suffice to demonstrate graphically how
the contractual prepayment penalty bore no reasonable
relationship to any legitimate view of Automotive's contractual
losses sustainable because of an assertedly premature prepayment
of the loan by Ridge during the time frame when the penalty
applied.  And unlike such cases as <u>United Order of Am.</u>
<u>Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son,</u>
<u>Inc.</u>, 519 F.2d 331, 335-36 (7th Cir. 1975), no special contextual
factors in this case provide any counterbalance that might point
in the other direction, in favor of any purported reasonableness
of Agreement's penalty provision.

Though it is scarcely necessary to go further in light of
the already-shown overkill involved in the Agreement's prepayment
formulation, this opinion will spend a moment or two in examining
how the second factor referred to in n. 11--Automotive's ability
to reinvest the prepaid principal--ratchets the degree of
arbitrariness, of unreasonableness, even higher.  In that respect
as well it should be remembered that just over a year is at issue
between the March 14, 2001 execution date of the Agreement and
the March 31, 2002 end of the prepayment penalty period.  It
could hardly be contended with any degree of persuasiveness that
it would have been reasonable to contemplate ex ante that

interest rates would decline more than a few percentage points during such a time frame. But to make an exceedingly generous assumption (generous to Automotive in the present context, that is), suppose that Automotive could have anticipated reinvesting the repaid money at only _half_ of the contract rate, or 5%. Although these are only rough approximations because they do not track the effect on an amortization schedule of installment payments at a different rate of interest, the disparities already discussed would roughly double: a prepayment on the first day of the Agreement's term would generate a prepayment penalty equal to about 350% of the potentially lost interest, a prepayment at the end of six months would generate a penalty amounting to about 650% of the remaining potential loss in interest, and a prepayment at the end of the first loan year would again produce an infinitely greater penalty than the nonexistent loss in interest (for twice infinity is also infinite).

In an effort to escape the fatal disproportion disclosed by the calculations set out to this point, Automotive seeks to add to the scales on its side of the inequalities the secret (that is, undisclosed to Ridge) payments that it had made arrangements to receive from Protective in connection with any service contracts ($121 each) and Gap policies ($18 each) sold by Ridge (A. R. Mem. 10-12). But that is impermissible, for such hidden side benefits known only to Automotive cannot fairly be used to

support the reasonableness of a prepayment penalty with which it seeks to saddle Ridge.

To analogize from another area of Illinois contract law, it is well established that "one may not be subjected to contractual obligations unless the obligation is clearly fixed by an express or implied agreement" (<u>Suarez v. Pierard</u>, 278 Ill. App.3d 767, 773, 663 N.E.2d 1039, 1044 (3d Dist. 1996)). To like effect, <u>Sethness-Greenleaf, Inc. v. Green River Corp.</u>, 65 F.3d 64, 67 (7th Cir. 1995)(citations omitted)) has put the matter in these terms:

> Contractual obligations are created and defined by objective signals the parties exchange. Private expectations are of no consequence.

Ridge cannot reasonably be held to have guaranteed an income stream deriving from an Automotive action about which it knew nothing.

To place the same concept in the matrix at issue here, every contracting party is entitled to shape its business conduct in terms of the costs and benefits of which it is aware. Ridge's decision to prepay or not to prepay the loan was properly formed on the basis of its <u>known</u> pluses and minuses (including an evaluation of the risk of enforceability or unenforceability of the contractually specified penalty), without reference to a wild card that was concealed up Automotive's sleeve and that could have distorted an otherwise fully informed analysis.

Automotive has presented no legal authority to the contrary, arguing only that Ridge is somehow to be charged with constructive knowledge that Automotive was receiving additional payments directly from Protective (A. R. Mem. 12-14). That argument is patently unpersuasive. Contrary to Automotive's contention, such knowledge does not flow as an obvious (or even as a likely) consequence of the facts that the Agreement required Ridge (1) to buy a specified number of Protective products each month or (2) if it did not, to pay the equivalent of the purchase price in reduction of the loan plus a specified service fee. Because the Automotive-Ridge transaction was a loan, the required numbers of monthly sales (and hence the service fee payments to Automotive) were plainly aimed at accomplishing the same purposes as a schedule of self-amortization: to keep interest payments current, and at the same time to apply amounts toward the principal balance that serve to reduce the lender's amount at risk on a regular basis.

As for the fact that Ridge negotiated the Agreement with Protective (Temple Dep. 23-24), that serves only to show the existence of a business relationship between Automotive and Protective (much as any seller of goods--and car dealers are a prime example--will often have a relationship with a financing source to facilitate its sales). There is certainly nothing in that situation to indicate that Protective was separately paying

Automotive some type of major kickback. So Automotive's proposal for constructive notice of such an unusual and undisclosed arrangement flunks the standard of reasonableness required of inferences for Rule 56 purposes. And thus on the pending summary judgment motions (and later as well), this Court will consider only the anticipated losses that Ridge knew about.

Nor is the analysis changed by Agreement ¶5's contingent provision for shortfall fees, which stated that if Ridge failed to sell the contractually specified minimum numbers of Protective products in any given month, Ridge would pay Automotive, in addition to the $289 or $92 remittance to be applied to the outstanding loan balance, a $75 fee for each product short of the minimum. As Automotive has itself pointed out (A. R. Mem. 10 n.7), sales of Protective products at the contractually specified minimum levels would not alone amortize the loan over its 36-month term (if it were not paid off earlier). It was in Automotive's interest to create an incentive to reach the contractual minimums each month (hence the insertion of the $75 "service fee" in the event of a shortfall)--in that way any future months' sales of products in excess of the contractual minimum numbers, which would in turn increase the monthly payments on account of the loan, would serve the desired goal of covering not only accrued loan interest but also principal payments, thus reducing the amount of outstanding indebtedness

22

and Automotive's level of risk.

That contract structure did not create any reasonably quantifiable expectation on Automotive's part that could serve to validate the excessive prepayment penalty. Automotive finds itself compelled to posit a hypothetical scenario of zero sales of Protective products by Ridge to speculate on a potential "loss" of $153,000 during the Agreement's first year (A. R. Mem. 10 n.8).[14] One need do no more than state that position to see its absurdity as a "reasonable" expectation in a situation that is premised on Ridge's continued performance under the Agreement. And once Automotive was instead repaid in full through prepayment (thus reducing its risk to zero), there was no longer any need to induce Ridge to comply with the repayment system set forth in Agreement ¶5. Hence the $75 fees do not qualify as "losses" to Automotive arising from prepayment so as to change the outcome.

In sum, Agreement's prepayment penalty formula is not at all a reasonable effort to determine actual losses, but is instead an unreasonable and hence unenforceable penalty (see Lake River, 769 F.2d at 1290; Raffel v. Medallion Kitchens of Minn., Inc., 139 F.3d 1142, 1146 (7th Cir. 1998)). What Automotive stood to

---

[14] In fact, consistently with its uniformly flawed approach, that footnote and the corresponding text use a $459,000 figure as though the relevant figures encompassed the entire 36-month term of the Agreement. As before, that distorts matters by blithely ignoring Ridge's unfettered and cost-free right to prepay the loan beginning with day 366.

receive by way of the prepayment penalty was grossly disproportionate to any reasonably anticipatable and legitimate loss. While Automotive is entitled to protect itself against the loss of its bargain if interest rates were to decline prior to Ridge's prepayment (LHD, 726 F.2d at 330; Village of Rosemont v. Maywood-Proviso State Bank, 149 Ill. App.3d 1087, 1091-92, 501 N.E.2d 859, 862 (1st Dist. 1986)), it is not entitled to do so through terms that amount to an unenforceable penalty.

Thus Ridge has not breached the Agreement by refusing to pay the amount demanded by Automotive pursuant to Agreement ¶6. Automotive's motion for summary judgment on Count I is denied.

<u>Unenforceability as to Gorman</u>

That same analysis compels the denial of summary judgment against Gorman on Count II. Because Agreement's prepayment penalty has been found unreasonable and thus invalid, it takes only a moment to see that it can no more be enforced against Gorman than it can be against Ridge.

Indiana law[15] says "[a] guaranty is a collateral promise or undertaking by one person to answer for the payment of some debt or the performance of some duty in the case of the default of another" (Vidimos, Inc. v. Vidimos, 456 N.E.2d 455, 458 (Ind. App. 3d Dist. 1983)). Because the prepayment penalty is not a

_____

[15] Both parties (R. Mem. 6; A. Mem. 6) accept the Guaranty's choice-of-law provision specifying a resort to Indiana substantive law (Complaint Ex. C).

24

valid obligation as to Ridge, by definition it is not enforceable against guarantor Gorman. Gorman's obligations under the Guaranty do not extend to any such unenforceable term in the underlying Agreement.

<u>Remaining Issues</u>

Although Automotive has thus failed in its effort to collect the unconscionably large amount of the Agreement ¶6 prepayment penalty, that does not call for Ridge's or Gorman's success on their respective Rule 56 motions. Caselaw both in the Illinois courts (see, e.g., <u>Telenois, Inc. v. Village of Schaumburg</u>, 256 Ill.App.3d 897, 902, 628 N.E.2d 581, 584-85 (1st Dist. 1993), <u>Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust Co.</u>, 240 Ill.App.3d 737, 752, 607 N.E.2d 1337, 1347 (4th Dist. 1993) and <u>H&M Driver Leasing Servs. Unlimited, Inc. v. Champion Int'l Corp.</u>, 181 Ill.App.3d 28, 31, 536 N.E.2d 858, 860 (1st Dist. 1989); cf. <u>Med+Plus Neck & Back Pain</u>, 311 Ill.App.3d at 861, 726 N.E.2d at 694) and in our Court of Appeals when applying Illinois law (cf. <u>Checkers Eight</u>, 241 F.3d at 563) teach that the unenforceability of a penalty provision still allows the aggrieved party to recover whatever actual damages it can prove. In this instance that would equate to any loss of yield suffered by Automotive in reinvesting its Capital at less than 10% between

the time of Ridge's prepayments and March 31, 2002.[16]

But it will be remembered that Automotive's ability to recover anything at all will depend on the resolution in its favor on the Ridge-Gorman claim that the prepayment was made at Automotive's behest (thus triggering its waiver of any prepayment premium or any damages) rather than at Ridge's election. So that disputed issue too remains to be resolved.

## Conclusion

Both sides' motions for judgment as a matter of law are denied. This action is set for a status hearing at 9 a.m. September 25, 2002 to discuss the procedures and timing for addressing and resolving the questions just identified under the rubric of Remaining Issues.

Milton I. Shadur
Senior United States District Judge

Date: September 12, 2002

---

[16] This opinion has already rejected Automotive's other unpersuasive contentions as to lost benefits from its bargain as Automotive has misportrayed it.